# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

|  |  |  |
|---|---|---|
| **DEBRA MARLOW,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL NO. 3:10cv18-DWD** |
| | ) | |
| **CHESTERFIELD COUNTY** | ) | |
| **SCHOOL BOARD,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter is before the Court by consent of the parties pursuant to 28 U.S.C. § 636(c) on Defendant's motion for summary judgment and Plaintiff's motion for leave to file supplemental exhibits in response to summary judgment. The matter has been thoroughly briefed after extensive discovery, and the Court has entertained oral argument. For the reasons set forth herein, the Court GRANTS the Plaintiff's motion for leave to file supplemental exhibits and DENIES the Defendant's motion for summary judgment.

## I. PROCEDURAL BACKGROUND

Debra Marlow ("Marlow" or "Plaintiff") brings this single-count age discrimination action against the Chesterfield County School Board ("School Board" or "Defendant") pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"). She alleges that her undisputably successful twenty-year career as an administrator in the school system ended in her being compelled to take early retirement after the decision was made to demote her based on the impermissible reason of her age. As the School Board has asserted, the essential

inquiry on summary judgment focuses on whether the comment by the Defendant's agent and employee, Superintendent Marcus Newsome ("Superintendent" or "Newsome"), concerning Marlow's lack of "21st Century skills" as a reason for the proposed demotion could constitute evidence of age discrimination. (Def.'s Br. Supp. Mot. Summ. J. ("Def.'s Br.") at 19.)

## II. PLAINTIFF'S MOTION FOR LEAVE

The case has progressed with contentious discovery, with each party zealously disputing the proper scope of discoverable material. On September 15, 2010, in response to the Plaintiff's motion to compel, the Court issued an Order compelling discovery and staying the Plaintiff's obligations to file an opposition to the Defendant's motion for summary judgment. Admittedly, the Order compelled the parties to abide by a "tight" schedule in order to preserve the scheduled trial date. Based on the present record, it appears that the Defendant has fully complied with the Order in good faith.

As part of their compliance with the previous Order of the Court, Defendants produced 3,446 emails to Plaintiff's counsel on the afternoon of October 4, 2010, approximately one week before the Plaintiff's opposition papers were due to be filed in response to Defendant's motion for summary judgment. On October 17, the Plaintiff moved for leave to file a document that the Defendant produced among the large volume of emails. Defendants oppose leave to file the supplemental evidence, citing primarily procedural reasons, while also, however, asserting that the documents, in fact, support its case. It is well within the Court's discretion to adjust briefing schedules. See, e.g., Fed. R. Civ. P. 56(c) (the deadlines under Rule 56 apply "unless a different time is set by local rule *or the Court orders otherwise*") (emphasis added). Because the Court has maintained a confined schedule, and finding no prejudice or undue delay to the Defendant,

the Court will consider the supplemental evidence to the extent material, and therefore will grant the Plaintiff's motion for leave to submit the additional documentation.

## III. FACTS

The Court has reviewed each party's statement of undisputed facts, including the extensive supporting documentation filed in support of the respective positions. Resolving all genuine disputes of material fact in favor of the Plaintiff, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), as required, and discounting those factual assertions that are immaterial, the Court has concluded that the following represents the undisputed material facts for purposes of resolving the pending motion for dispositive relief.

In 1987, the School Board hired Marlow to serve as the Director of Community Relations ("DCR"), and she continued to successfully serve in this position for approximately twenty (20) years. (Pl.'s Br. Opp'n Mot. Summ. J. ("Pl.'s Br.") at Exs. 2, 3; Marlow Aff. ¶ 1.) Her primary role as DCR was that of public relations director of the Chesterfield County school system, reporting directly to the Superintendent. (Marlow Aff. ¶ 1.) Until the creation of the Director of Business and Government Relations ("DBGR") position in 1998, Marlow's responsibilities also included legislative lobbying on behalf of the School Board. (Id. at ¶¶ 1,2.) The record indicates that she was successful in the position throughout her career. (Id. at ¶ 3; Pl.'s Br. at Exs. 2, 3.)

Around 2004, Tim Bullis ("Bullis") was hired as Marlow's Assistant Director of Community Relations. Bullis was previously a newspaper reporter with approximately two (2) years of experience in the educational field. (Pl.'s Br. at Ex. 4.) It is undisputed, as well, that Bullis was successful throughout his tenure in his position. In fact, there is at least some evidence that Newsome favored Bullis' suggestions, and that Marlow would, at times, have

3

Bullis present her ideas to Newsome, "masked" as his own. (Marlow Decl. ¶ 5.)

In 2006, the School Board hired Dr. Newsome to serve as Superintendent. During his first year, he led the School Board in an effort to implement a six-year strategic plan to implement "21st Century skills" at all levels of the Chesterfield County school system. (Newsome Aff. ¶ 4; Evans Aff. ¶¶ 5, 6; Def.'s Br. Supp. Mot. S.J. ("Def.'s Br.") at Exs. B, C.) It is beyond dispute that, at least in large measure, the otherwise vague phrase "21st Century skills" refers to a nationally-recognized skill set. (Newsome Aff. ¶ 5; Evans Aff. ¶ 7; Def.'s Br. at Ex. D, E.)[1] The primary focus of this skill set concerns the integration of modern technologies for research, organization, evaluation, and communication of information. (Def.'s Br. at Ex. D; Newsome Aff. ¶ 6.) In essence, "21st Century skills" became a priority within the School Board's strategic plan under Newsome's leadership. (See Def.'s Br. at Ex. F.)

Until 2007, Marlow reported directly to the Superintendent in her capacity as DCR. As such, she participated in the Superintendent's "Direct Report Meetings."[2] (Marlow Aff. ¶ 6.) In mid-2007, the Superintendent decided that Marlow should instead report to the Executive Assistant Superintendent and no longer attend the "Direct Report Meetings." (Newsome Dep.

---

[1]Plaintiff disputes the evidence that "21st Century skills" are a recognized skill set. (Pl.'s Br. at Ex. 1.) Specifically, Plaintiff argues that this evidence is not relevant, and that it is the subject of hearsay. (Id.) However, this evidence is relevant because it bears on the issue of what the Superintendent meant when he used the challenged phrase. Moreover, the affiants' statements proffered by the School Board have provided sufficient evidence that they are personally familiar with the use of this phrase, by virtue of their personal training, so their testimony is not inadmissible as hearsay. There remains, however, a genuine issue of material fact as to whether Dr. Newsome's *use* of the phrase "21st Century skills" could have reflected an age-bias with respect to Marlow.

[2]The Superintendent's "Direct Report Meetings" are regular meetings generally involving only those administrators who report directly to the Superintendent. (Marlow Decl. ¶ 6.)

8:23-9:1, 10:1-10:13, 84:7-84:15.) Between late 2007 and early 2008, for an approximately six

(6) month period, Bullis served as the interim Executive Assistant Superintendent. (Bullis Dep.

5:16-5:25.)[3] During this time, to avoid the "awkward arrangement" of Marlow reporting to her

former subordinate, the Superintendent made Marlow his "direct report" again, also including her

in the "Direct Report Meetings." (Newsome Dep. 17:1-17:11; Marlow Decl. ¶ 8.)

　　In the spring of 2008, Marlow reluctantly accepted the position of DBGR at the behest of

the Superintendent. (Newsome Aff. ¶¶ 11, 12; Evans Aff. ¶ 12; Marlow Decl. ¶ 9.) Marlow

opposed the transfer, and proposed that the DBGR responsibilities be reassigned to her as DCR,

a measure that would have purportedly "saved" Chesterfield County approximately $150,000 in

budgetary allotment. (Marlow Decl. ¶ 9; Newsome Dep. 28:16-28:23; 29:21-30:3.) Indeed,

Marlow had previously performed the same responsibilities as DCR. (Marlow Decl. ¶ 9.)

However, Newsome rejected Marlow's idea and proceeded with the transfer, as subsequently

adopted by the School Board. (Id.) As a result of the transfer, Marlow no longer attended the

"Direct Report Meetings." (Id. ¶ 11.)[4]

　　In the Spring of 2008, it also started to become apparent to the Superintendent that

---

[3]Plaintiff suggests that the manner in which Bullis "leapfrogged" Marlow for this
superior, albeit interim position, is further evidence of age discrimination vis-a-vis Newsome's
favoritism of Bullis. (Pl.'s Br. at 3.) However, Marlow did not seek this position, and there is no
evidence that age-related discrimination played any role in Bullis' interim employment. Thus,
the Court does not consider it material to the resolution of the motion for summary judgment.

[4]Marlow and Newsome offer different accounts of how and why Marlow transferred from
DCR to DBGR. The undisputed evidence suggests that this transfer was not a so-called "slight"
to Marlow, or an adverse employment action. At oral argument, counsel for the School Board
asserted that Marlow must prove as much to prevail. If such a position were correct, summary
judgment might be appropriate. But another theory of Marlow's case is that her purported
demotion was, itself, a discriminatory adverse action, and Marlow can therefore "survive"
summary judgment by offering sufficient evidence in support of her theory. (Compl. ¶¶ 30-31.)

significant budget reductions were on the horizon for fiscal year 2009, although the extent of future "cuts" was not yet clear.  (Pl.'s Br. at Ex. 6.)  It was also obvious that some measure of fiscal strain would affect the fiscal year 2010 budget.  (Id.)  However, there is no evidence that at that time, the Superintendent had any knowledge, or intention, that any particular position would be terminated pursuant to a future reduction in force ("RIF") initiative.

In the early summer of 2008, the School Board conducted a public, competitive hiring process to replace Marlow as DCR.  (Newsome Aff. ¶ 13; Evans Aff. ¶ 15; Def.'s Br. at Ex. N.)  There is no dispute that Newsome favored Bullis for this position; and that, in fact, Marlow provided a reference in support of Bullis.  The panel narrowed a field of forty-three applicants to six, interviewed each of the six, and ultimately recommended Bullis.  (Id.)  The School Board voted to accept the recommendation that Bullis be promoted to DCR, and he began his work in the position on July 1, 2008.  (Def.'s Br. at Ex. M.)

By October 2008, the financial forecasts for the future School Board budget appeared even more dismal than first anticipated.  It became clear that the budget for fiscal year 2010 would be dramatically impacted "like no other in [] 30 years."  (Kitchen Aff. ¶ 9; Def.'s Br. at Ex. R.)  By November and December of 2008, it became obvious that the projected shortfall could reach approximately $52 million.  (Newsome Aff. ¶ 14; Kitchen Aff. ¶ 10; Def.'s Br. at Ex. S.)  On December 9, 2008, the worsening financial situation prompted Kathy Kitchen ("Kitchen"), the Assistant Superintendent for Finance, to forward an email to all Assistant Superintendents advising of the need to make significant budgetary reductions.  (Kitchen Aff. ¶ 11; Def.'s Br. at Ex. T.)

On December 10, 2008, Dr. Sharon Thomas ("Thomas"), Chief Executive to the

Superintendent and Marlow's direct supervisor at the time, initiated discussions with Marlow about possible budgetary reductions within the Business and Government Relations Department. (Thomas Aff. ¶ 3; Frickert Dep. 10-12.)  Thomas included Ms. Martha Frickert, the retiring Communities in Schools ("CIS") Administrator, to determine which position ought to be RIF'd. (Id.)  Thomas proposed the possibility that the responsibilities of CIS be absorbed into Marlow's position as DBGR, but both Frickert and Marlow opposed the idea.  (Thomas Aff. ¶ 6; Frickert Dep. 10-15.)  They explained, in support of their position, that the schools could lose a specific type of accreditation without a full-time CIS.  (Id.)

During the month of December 2008, Thomas and Newsome contemplated the elimination of either the CIS position, or the DBGR position.  (Thomas Aff. ¶¶ 6, 10; Pl.'s Br. at Ex. 10.)  Ultimately, the Superintendent decided to propose a RIF of the DBGR position, and the elimination of the entire Business and Government Relations Department.  (Thomas Aff. ¶ 10; Newsome Aff. ¶¶ 17-18.)  On or about January 12, 2009, Newsome informed Marlow of his recommendation, further recommending that the CIS Administrator position be offered to her. (Newsome Aff. ¶ 19; Marlow Decl. ¶ 12.)  At the meeting, Marlow contested the decision, citing her seniority over her former subordinate, Bullis, and contending that the proposal constituted a demotion.  (Marlow Decl. ¶ 12.)  In response, Newsome stated that he wants "21st Century communication skills, and Tim [Bullis] is better at that."  (Id.)  Newsome had never previously offered such a criticism as to Marlow's performance.  (Id. at ¶ 15.)

At the same time, the School Board had a stated RIF policy which required that, when two positions are of the same "position classification," certain factors must be applied to determine which position to RIF, including job performance, special skills, and specific needs.

7

(Pl.'s Br. at Ex. 17.)  When no significant difference existed, the less senior person would be "laid off."  Alternatively, if there is only one person in a particular "position classification," that person would be terminated.  (Id.)  The RIF policy did not define the phrase "position classification," and while the DCR and DBGR are both at the "grade level" 44, they have at least different job titles.  (Def.'s Br. at Exs. I, J.)

On January 30, 2009, Newsome sent a memorandum to Marlow officially informing her that he would recommend a RIF of the DBGR position to the School Board for fiscal year 2010.  (Pl.'s Br. at Ex. 22; Marlow Decl. ¶ 13.)  The School Board tentatively adopted the fiscal year 2010 budget on March 3, 2009, not including any funding for the DBGR position .  (Newsome Aff. ¶ 21; Marlow Decl. ¶ 14; Def.'s Br. at Ex. X.)  The decision would not become final until a final and full School Board vote, which did not occur until April 28, 2009.  (Kitchen Aff. ¶ 18.)  For fiscal year 2009, the School Board accepted all 37 RIFs proposed by the Superintendent.  (Pl.'s Br. at Ex. 6.)

In the interim, on March 11, 2009, Marlow voluntarily submitted her notice of intent to retire effective July 1, 2009.  (Evans Aff. ¶ 19; Marlow Decl. ¶ 14.)  Upon her reassignment to the position of CIS, Marlow's annual base salary would have decreased from $115,623 per year to $109,842 per year, and her $9,000 annual car allowance would be eliminated.  (Marlow Decl. ¶ 14; Carter Aff.¶¶ 3-5, Ex. 1.)  Moreover, her supplemental retirement benefit ("SRP") would have decreased from $218,090 to $192,223, but her Virginia Retirement System ("VRS") benefit would not have been negatively impacted.  (Carter Aff. at Ex. 1.)  Marlow avoided the economic impact of the transfer by submitting her retirement notice prior to the transfer becoming effective.  (Marlow Decl. ¶ 14.)

Contemporaneously, Newsome proposed a RIF of two technology education teachers. (Pl.'s Br. at Exs. 16, 19; Hill Aff. ¶ 3; Gray Aff. ¶ 3.)  To determine which teachers to terminate, the Superintendent invoked the "needs" of the school system and the "skills" of those teachers in the "position classification."  (Gray Aff. ¶ 8.)  He used a list which ranked the teachers by seniority, and also indicated the teachers' technology-based coursework during college, no matter how long ago the person attended college.  (Id.; Pl.'s Br. at Ex. 16.)  The *most senior* technology teacher and the *oldest* technology teacher on the list were the only technology educators chosen for termination.  (Id.)  The stated reason for terminating those two teachers was their lack of completed computer classes reflected on their college transcripts, and the fact that neither taught "Auto CAD" classes.  (Id.; Gray Aff. ¶¶ 8-10.)  However, one teacher within the same "position classification" was not even included on the list.  (See Pl.'s Br. at Exs. 16, 19.)  Moreover, the same teacher did not even teach "Auto CAD" classes, and was among the youngest technology educators on the list.[5]  (Id.; Hill Decl. ¶ 10; Gray Decl. ¶ 12.)

On April 28, 2009, the Superintendent circulated a memorandum interpreting the otherwise undefined phrase of "position classification," as utilized in the School Board's RIF policy.  (Pl.'s Br. at Ex. 18.)  In the memorandum, "position classification" was defined as "those graded classifications listed in the document entitled *Chesterfield County Public School Coordinated Pay Plan, 2008-2009 School Year*."  (Id. (emphasis in original).)  In doing so, the Superintendent cited School Board Policy 533, which directed him to make such interpretations

---

[5]Plaintiff points to the discrepancies involved with the RIF of the technology education teachers as evidence that the RIF policies were unfairly applied against older employees, particularly when the criterion involved "technology skills" or "21st Century skills."  (Pl.'s Br. at 15-16; Def.'s Br. at 5; Newsome Dep. At 53-55.)

when applying the Policy to "specific cases."  (Id.)  He also stated that the interpretations would be "needed as a result of the requirement to reduce expenditures in the next fiscal year."  (Id.)

On August 13, 2009, Newsome presented a PowerPoint presentation on "21st Century Learning" to his staff.  (Pl.'s Br. at Ex. 25.)  In the presentation, Newsome used slides depicting people of various ages using a variety of technologies.  (Id.)  He also asked participants to participate in a "CITE Survey," which began by categorizing people into age-ranges such as "younger than 30" or "52 or older."  (Id.)  One slide explained the distinction between "digital natives," which was defined as those who are born at a time when a particular technology exists, and "digital immigrants," who are born before a particular technology is invented.  (Id.)  That slide further explained that "[d]igital immigrants are said to have a 'thick accent' when operating in the digital world in distinctly pre-digital ways, when, for instance, one might 'dial' someone on the telephone to ask if his e-mail was received."  (Id.)  A subsequent slide appears to demonstrate that brain function while using technology is higher in those who are "digital natives."  (Id.)

**IV. STANDARD OF REVIEW**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.  In reviewing a motion for summary

judgment, the Court must view the facts in the light most favorable to the non-moving party.  Id. at 255.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact.  Anderson, 477 U.S. at 247-48 (emphasis in original).  Indeed, summary judgment must be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Of course, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Anderson, 477 U.S. at 255.

Furthermore, a "material fact" is a fact that might affect the outcome of a party's case.  Anderson, 477 U.S. at 247-48; JKC Holding Co. LLC v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001).  Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248; see also Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001).  A "genuine" issue concerning a "material" fact only arises when the evidence, viewed in the light most favorable to the non-moving party, is sufficient to allow a reasonable jury to return a verdict in that party's favor.  Anderson, 477 U.S. at 248.

# V. DISCUSSION

In order to prove a claim for age discrimination, a plaintiff must prove, by a preponderance of the evidence, that the defendant discriminated against her "because of" age; that is, age was the "but for" cause of the adverse employment action. Gross v. FBL Fin. Servs., Inc., __ U.S. __, 129 S. Ct. 2343, 2351 (2009).[6] Such evidence may be either direct or circumstantial. Id. (citing Reeves v. Sanderson Plumbing Products, 530 U.S. 133, 141-143 (2000). If the only sufficient evidence is circumstantial, the Court generally follows the burden-shifting framework employed in McDonnell Douglas Corp. V. Green, 411 U.S. 792 (1973). Reeves, 530 U.S. at 142.[7]

## A.    Direct Evidence

Here, the Plaintiff argues that there is both direct and circumstantial evidence, and that the existence of direct evidence relieves her from the burden-shifting analysis under McDonnell Douglas. (Pl.'s Br. at 21-25.) Direct evidence is evidence that the employer "announced, or admitted, or otherwise unmistakably indicated that age was a determining factor" in the particular

---

[6]At oral argument, the School Board argued that Gross controls and directs summary judgment. Such a conclusion ignores the procedural posture of that case. There, the Court reversed and *remanded* based on the use of a "mixed-motives" jury instruction, finding that it impermissibly shifted the ultimate burden from the plaintiff. Gross, 129 S. Ct. at 2346. The Court's ruling had nothing to do with the sufficiency of the evidence required to submit the question to a jury. Indeed, on remand, the Eighth Circuit Court of Appeals further remanded the case for a new trial. Gross v. FBL Fin. Servs., Inc., 588 F.3d 614, 622 (2009).

[7]The Defendant also argues that the Superintendent's actions, even if discriminatory, "cannot legally be imputed to the School Board." (Id. at 17.) Such a conclusion ignores the "law of the case," resulting from the Court's Memorandum Opinion granting Newsome's motion to dismiss, which noted that "§ 630(b) prescribes respondeat superior" liability only. (Docket No. 16 at 10.) See Walker v. Kelly, 589 F.3d 127, 137 (4th Cir. 2009). Because the School Board puts forth no cognizable argument that the Superintendent is *not an agent* of the School Board, the Court cannot grant summary judgment on such a basis.

employment action.  <u>Cline v. Roadway Express, Inc.</u>, 689 F.2d 481, 485 (4th Cir. 1982) (citations omitted). The purported direct evidence on which Marlow relies is the comment about Marlow's "21st Century skills."  (Pl.'s Br. at 21.)

There is also circumstantial evidence that Newsome associated "21st Century skills" with a person's age, such that an "inference of age discrimination may rationally be drawn independently of any presumption."  <u>Cline</u>, 689 F.2d at 485.  When such circumstantial evidence is adduced, "there is no need to employ the <u>McDonnell Douglas</u> presumption-based proof scheme either to determine its sufficiency to raise issues for the trier of fact or for resolution of the issue by that trier."  <u>Id.</u> (citing <u>Spagnuola v. Whirlpool Corp.</u>, 641 F.2d 1109, 1113 (4th Cir. 1981)).

In this case, the only direct evidence is that Newsome used Marlow's apparent lack of "21st Century skills" as a criterion to RIF Marlow, as opposed to Bullis.  Alone, and in isolation, the comment does not impugn the Superintendent's decision with the specter of age discrimination, and is therefore not *direct* evidence of age discrimination.  Only in the context of the available *circumstantial* evidence could a jury find that "21st Century skills" might have reflected an age-bias.  Specifically, Newsome's August 13, 2009 PowerPoint presentation suggests several indicia that "21st Century skills" correlate with age.  (Pl.'s Br. at 25.)  Most notably, for example, two slides cite research on a distinction between "digital natives" and "digital immigrants" -- a distinction resulting from when a person was born relative to others, and highlighting the "thick accent" of the older "digital immigrants."  (<u>Id.</u>)

Additionally, such potential age-related bias may be further reflected by the decisional process used to RIF the technology teachers.  The most senior and oldest "tech eds" were

eliminated based on their relative lack of "technology skills," which were measured by the volume of computer courses taken while in college.[8]  (Pl.'s Br. at Exs. 16; Gray Decl. ¶¶ 9-10; Hill Decl. ¶¶ 8-10.)  The School Board placed great emphasis on the need for "Auto CAD" teachers, but did not include one of the youngest, and least senior, teachers on the list, even though she did not teach "Auto CAD."  (Gray Decl. ¶ 12; Hill Decl. ¶¶ 6, 10-11; <u>compare</u> Pl.'s Br. at Ex. 16 <u>with</u> Pl.'s Br. at Ex. 19.)  Such evidence could, indeed, at least suggest that the Superintendent and other decision-makers on his staff may have correlated age with technology skills.  Such a correlation, which can constitute age-bias, may have been what the Superintendent meant when he questioned Marlow's "21st Century skills."  Or, as the School Board asserts, it may only have been an innocuous, gratuitous comment.  Ultimately, such a resolution of the issue is for a jury to decide.  See <u>Anderson</u>, 477 U.S. at 255.

It is arguable that the circumstantial evidence of age-bias in the case is sufficient to draw an "inference of age discrimination" such that a detailed <u>McDonnell Douglas</u> analysis is unnecessary.  <u>See</u>  <u>Cline</u>, 689 F.2d at 485 (holding that the burden-shifting analysis is unnecessary where the circumstantial evidence, alone, permits an inference of age discrimination).  Nevertheless, because the parties have engaged in such an analysis, and for possible review, the Court will address the issue.

**B.      Analysis Under <u>McDonnell Douglas</u>**

Pursuant to the <u>McDonnell Douglas</u> framework, the Plaintiff must establish a *prima facie* case of age discrimination by showing that she: (1) was age 40 or older; (2) was performing her

---

[8]Although "technology skills" and "21st Century skills" are not necessarily identical terms of art, the School Board's purported definition of "21st Century skills" relies principally upon a person's ability to use technology in general.  (Newsome Dep. at 53-55; Def.'s Br. at 5.)

job satisfactorily; (3) suffered an adverse employment action; and (4) was replaced by a comparably qualified younger employee. <u>Reeves</u>, 530 U.S. at 142. In cases involving a RIF, such as this case, the fourth element may be satisfied by showing that persons outside the protected age class were retained in the same position, or that there was some other evidence that the employer did not treat the plaintiff age-neutrally in deciding upon how to implement the RIF. <u>Herold v. Hajoca Corp.</u>, 864 F.2d 317, 320 (4th Cir. 1988).

The School Board concedes that Marlow is a member of the protected class and was meeting her employment expectations. (Def.'s Br. at 17.) Thus, for Marlow to establish her *prima facie* case at the summary judgment stage, the record must still contain more than a mere scintilla of evidence that she: (1) suffered an adverse employment action; and (2) that the School Board did not treat Marlow age-neutrally in making its RIF decision. <u>See</u> <u>Jennings v. Univ. of N.C.</u>, 444 F.3d 255, 266 (4th Cir. 2006) (citing <u>Anderson</u>, 477 U.S. at 248). In conducting the analysis, the Court cannot, itself, weigh the evidence. <u>See</u> <u>Anderson</u>, 277 U.S. at 255. Rather, the Court must determine whether the evidence of record is sufficient for submission to the jury. <u>Id.</u>

**1.)      Adverse Employment Action**

The School Board challenges the argument that it took any adverse action against Marlow for three principal reasons. First, it argues that Marlow retired before the School Board acted to accept the Superintendent's recommendation, and that she therefore never suffered an adverse action. (Def.'s Br. 22-23.) Second, the School Board attacks the notion that a reassignment from DBGR to Administrator of CIS created such conditions as to constructively discharge Marlow. (Def.'s Br. 24-25.) Finally, the School Board challenges whether Marlow properly mitigated her

damages as required in claims for constructive discharge.  (Def.'s Br. at 27.)

As a preliminary matter, it should be noted that Marlow has not pleaded "constructive discharge," rather, she bases her theory of liability on the notion that the RIF and reassignment to Administrator of CIS was, itself, a discriminatory, adverse employment action.  (See Pl.'s Br. at 26.)  A "constructive discharge" allows a plaintiff to satisfy the "tangible [adverse] employment action" element when conditions of employment become intolerable, *even though the employer takes no action*.  See Whitten v. Fred's, Inc., 601 F.3d 231, 248 (4th Cir. 2010).  Here, the employer took affirmative action by announcing its intention to demote Marlow.  Her allegation that she was "forced to retire" is, therefore, simply a factual assertion concerning the results of the adverse employment action -- namely, the proposed demotion to CIS Administrator.  (Compl. ¶¶ 24-25.)  In essence, Marlow contends that an adverse employment action occurred regardless of whether Newsome or the School Board wished for her retirement when transferring her from DCR to DBGR.  Thus, the Fourth Circuit does not require her to mitigate damages to any greater extent than that required by 42 U.S.C. § 2000e-5(g), and the School Board's arguments concerning "constructive discharge" are irrelevant to the Court's analysis.  See Dennis v. Columbia Colleton Medical Center, Inc., 290 F.3d 639, 651 (4th Cir. 2002).

The School Board's argument that it had not yet acted on Newsome's recommendation at the time of Marlow's retirement is also to no avail.  Indeed, the record shows that the School Board accepted *every* RIF recommendation submitted by Newsome for the 2010 fiscal year. (Pl.'s Br. at Ex. 6.)  Moreover, Marlow submitted her retirement notice *after* the School Board adopted a preliminary budget that excluded any funding for the DBGR position.  (Newsome Aff. ¶ 21; Evans Aff. ¶ 19; Marlow Decl. ¶ 14; Def.'s Br. at Ex. X.)  Thus, there is sufficient evidence

that the School Board acted "like a cat's paw for or ruber-stamp[ed]" the Superintendent's RIF recommendations. See Hill v. Lockheed Logistics Management, Inc., 354 F.3d 277, 290 (4th Cir. 2004).

The Superintendent had "principal responsibility" to determine which positions to RIF, particularly with regard to those administrative positions that he closely supervised. Id. at 289. "Such individuals, although perhaps not acting as formal decisionmakers, nonetheless act in a supervisory or managerial capacity as the agents of the employer." Id. Indeed, the evidence suggests that the School Board had made such a preliminary decision adopting the recommendation *before* Marlow submitted her retirement papers, as evidenced by the preliminary budget adopted on March 3, 2009. (Def.'s Br. at Ex. X.) The interplay between the Superintendent's authority and that of the School Board is one of local government law in Virginia. See Va. Code. §22.1-313(A). How such a scenario "plays out" in an employment context is, however, an issue for the factfinder's resolution, and the School Board may, at trial, present evidence demonstrating the limitations of the Superintendent's authority, if such evidence exists.[9]

In its argument concerning "constructive discharge," the School Board also challenges whether transferring Marlow to the CIS position would have created "intolerable conditions." (Def.'s Br. at 24-25.) In doing so, the School Board analyzes the different conditions of

_____

[9]The tenor of the deposition testimony suggests that Newsome and Thomas made the decisions, and exercised considerable discretion in the process. For example, the School Board cites Thomas' deposition testimony to parse the reasons for choosing to eliminate the DBGR position, rather than the DCR position. (Def.'s Br. at 16.) Responding to the question: "if there were any vacancies in community relations then it would have been an option to look at," Thomas responded: "[w]e *may* have looked at it." (Thomas Dep. 79:25-80:3 (emphasis added).)

17

employment between the CIS position and the DBGR position. (Id.) Although "constructive

discharge" is not at issue, the analysis of the two positions is relevant to determining whether an

adverse employment action occurred at all, simply from the decision to transfer Marlow which

she characterizes as a "demotion." (Pl.'s Br. at 8.)

A modification in job duties and responsibilities, even duties that are encompassed within

a former job description, may nevertheless constitute an adverse employment action. Burlington

N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 70-71 (2006). "Whether a particular reassignment

is materially adverse depends upon the circumstances of the particular case, and should be judged

from the perspective of a reasonable person in the Plaintiff's position, considering all

circumstances." Id. at 71. Although the School Board places significant emphasis on the

minimal decrease in pay that Marlow would incur from the proposed transfer, it nonetheless

constituted a decrease. (Carter Aff. at Ex. 1; Def.'s Br. at Exs. I, J; Pl.'s Br. at Ex. 22.)[10] She

also would have "lost" her car allowance of $9,000 per year. (Carter Aff. ¶ 5.) Most notably,

however, she would have been demoted to a position that she formerly supervised and which was

two grade levels below her prior position. (Pl.'s Br. at Ex. 22.)

The School Board also emphasizes the pecuniary outcome of Marlow's decision to retire

in 2009, as opposed to remaining employed for five additional years. True, the undisputed

evidence indicates that her VRS retirement would have increased by $10,008 per year if she had

---

[10]Although not dispositive, the Court notes that Marlow told Newsome that the
prospective decrease in pay was the reason that she viewed the employment action as
discriminatory. (Marlow Decl. ¶ 13.) In fact, during the deliberative process, Thomas and
Newsome considered maintaining Marlow's pay at "Grade Level 44," at least for one year, but
instead chose to reduce it to "Grade Level 42," upon her prospective transfer to CIS. (Compare
Pl.'s Br. at Ex. 14 with Def.'s Br. at Ex. V.)

remained employed for those additional years. (Carter Aff. at Ex. 1.) However, Marlow would have been required to work five additional years with a yearly compensation decrease of $14,781. (Id.) The Court cannot conclude, as a matter of law, that it would have been to Marlow's advantage to accept the transfer, working for less compensation, only to receive a marginally higher retirement benefit from being employed five additional years in the VRS system. Indeed, the School Board's analysis discounts the value of early retirement itself, which becomes considerably more attractive when a person is faced with the prospect of diminishing compensation.

However captioned, as a transfer or a demotion, the elimination of the DBGR position and the proposed transfer of Marlow to Administrator of CIS is adequate to present a triable question of whether an adverse employment action occurred. Therefore, summary judgment is not available on at least that element of Plaintiff's proffered *prima facie* case.

### 2.) Retention of Younger Employees and Age Neutrality

The School Board cannot, from the record, challenge the fact that the younger Director-level employee, Bullis, retained his position. That, alone, may suffice to satisfy the second disputed element of Marlow's *prima facie* case. However, the School Board also argues that the RIF decision was an age-neutral one -- addressing the ultimate issue. The analysis of that issue focuses on the Plaintiff's rebuttal of the School Board's stated non-discriminatory reasons for the RIF. Thus, the Court must evaluate that argument, analyzing whether the same evidence asserted (i.e. Newsome's "21st Century skills" PowerPoint and the tech educators' RIF) present a genuine issue of material fact on the question of age-neutrality that precludes the granting of dispositive relief.

**C.      The School Board's Legitimate, Non-Discriminatory Reasons**

Once the Plaintiff has established a *prima facie* case, the burden of persuasion shifts to the School Board to articulate legitimate, non-discriminatory reasons for the employment action. Reeves, 530 U.S. at 142. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" Id. (quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993). Once the defendant offers admissible evidence sufficient for the jury to conclude that legitimate non-discriminatory reasons were the cause of the adverse employment action, "the McDonnell Douglas framework -- with its presumptions and burdens" -- disappears. Id. at 142-43. The Plaintiff must then carry the ultimate burden of proving intentional discrimination based on age. Id. at 146. Such proof may be separate evidence of age animus or the resulting reasonable inference of discrimination based on evidence that the employer's explanation is false. Id. at 146-47. Marlow offers both measures of possible proof.

The School Board has offered, at a variety of times and under a variety of circumstances, several legitimate, non-discriminatory reasons for terminating the DBGR position**.** From the outset, it has asserted that the fiscal crisis brought about by various economic circumstances was the principal reason for the decision to terminate the position. (Def.'s Br. at Ex. V; Newsome Aff. ¶¶ 15-19; Thomas Aff. ¶¶ 4-10.) It has also cited its RIF policy, indicating that it targeted the Business and Government Relations Department, not the Community Relations Department, and therefore the School Board was *compelled* to terminate the DBGR position. (Evans Aff. ¶ 21.) Finally, the School Board has emphasized that the Superintendent's "[21st Century skills] comment can only fairly and reasonably be viewed as evidence of his belief that Bullis was better skilled than Marlow." (Def.'s Br. at 19.) Indeed, the School Board argues that whether

Newsome was accurate in this assessment is irrelevant, and that such a rationale would still

constitute a legitimate non-discriminatory basis for the RIF decision to eliminate Marlow's

position. (Id.)

To successfully rebut the School Board's legitimate, non-discriminatory reasons, Marlow

must show that the School Board's explanation is "unworthy of credence," or otherwise offer

"other forms of circumstantial evidence sufficiently probative of age discrimination." Mereish v.

Walker, 359 F.3d 330, 336 (4th Cir. 2004) (citations omitted). Moreover, establishing that the

employer's reason was false becomes part of, and often considerably assists, in proving that the

real reason was the result of intentional discrimination. Reeves, 530 U.S. at 147 (citation

omitted).

**1.)     Fiscal Year 2010 Budget Shortfall**

The Court notes that there is no disputing the overwhelming fiscal crisis that the School

Board was faced with in the spring of 2009. (Def.'s Br. at Exs. Q, R, S, T; Pl.'s Br. at Exs. 6, 7,

22; Newsome Aff. ¶ 14; Thomas Aff. ¶ 4; Kitchen Aff. ¶ 10.) Indeed, the shortfall for fiscal year

2010 swelled to $52 million, and the School Board had no choice but to make a number of

budgetary reductions. The January 30, 2009 memo from Newsome to Marlow asserts that the

fiscal crisis was the sole reason for terminating the DBGR position. (Pl.'s Br. at Ex. 22.) The

parties have both established that the fiscal crisis was severe, and the only disputed point is when

the crisis became clear, to whom, and to what extent. (Compare Def.'s Br. at 8-11 with Pl.'s Br.

at 4-7.)[11]  Thus, the School Board's fiscal crisis is, without question, one legitimate, non-discriminatory basis for the employment action at issue.  However, the fiscal crisis is but the backdrop for the RIFs that resulted from the budget cuts, and the manner in which the RIF decisions were made is central to the case.  See, e.g., Herold, 864 F.2d at 320 (holding that the manner in which a RIF was applied could be discriminatory).  Thus, the fiscal realities facing the School Board are not dispositive.

        **2.)**      **Application of the School Board's RIF Policies**

Marlow has made the application of the School Board's RIF policy a central issue in her case, pleading that it was not properly implemented with respect to Marlow and Bullis. (Complaint ¶¶ 20, 26.)  In response, the School Board has argued that Marlow has misapplied the policy, and that proper application of that policy essentially required the School Board to terminate her, rather than Bullis.  (Def.'s Br. at 21; Def.'s Reply Supp. Mot. Summ. J. ("Def.'s Reply") at 6-7.)  Thus, the School Board argues that application of the RIF policy is, itself, a further legitimate, non-discriminatory reason for the decision to terminate the DBGR position. But to reach such an outcome requires a factual determination of what the School Board meant by the phrase "position classification," as that term of art is used in the School Board's RIF policy.  The policy is vague and ambiguous with respect to the phrase, as the School Board classifies employees in a number of different ways, including job title, grade level, and position

_____

[11]Based on this dispute of fact, Marlow asserts, as only one of her theories of liability, that Newsome knew the extent of the pending crisis when he initially transferred her to the DBGR position.  (Compl. ¶ 16; Pl.'s Br. at 5-6.)  The evidence in the record indicates otherwise. Although there is evidence of some budgetary restrictions and fiscal strain on the horizon, the first indication of the magnitude of the problem surfaced in September and October 2008 -- after Marlow accepted the DBGR position.  (Def.'s Br. at Exs. Q, R.)  If such were the sole theory of liability, the Court might be compelled to grant summary judgment.  But, such is not the case.

number.  (See Def.'s Br. at Exs. I, J.)[12]

The Superintendent and the School Board admit as much by their *post hoc* interpretation of the phrase "position classification."  (Pl.'s Br. at Ex. 18.)  On April 28, 2009, nearly three months after Newsome informed Marlow of his decision to RIF her position, he issued a memorandum interpreting several aspects of the RIF policy.  (Id.)  Most notably, he interpreted the term "position classification" as those "graded classifications listed in the document entitled *Chesterfield County Public School Coordinated Pay Plan, 2008-2009 School Year*."  (Id. (emphasis in original).)  Based on the exchange at oral argument, the statement apparently equates "position classification" with one's job title.  According to such an interpretation, Marlow and Bullis are *not* in the same "position classification;" and, therefore, only Marlow could be terminated once the Superintendent made the decision to make the changes in the Business and Government Relations Department.  (Def.'s Reply at 6-7.)  Indeed, the School Board asserts that it could not have legally eliminated Bullis job as a result of the RIF policy. There is, however, no legal authority for such a proposition.[13]

_____

[12]At oral argument, the School Board asserted that the phrase is not vague or ambiguous. A word is "vague" and "ambiguous" if its meaning is "uncertain."  Black's Law Dictionary 88, 1584 (8th ed. 2004).  Given the variety of modes by which the School Board classifies its employees, and the apparent need for the Superintendent to define the phrase, the meaning of "position classification" was very much uncertain in the spring of 2009.  (Pl.'s Br. Ex. 18; Def. Br. at Exs. I, J.)

[13]The School Board appears to cite Dugan v. Albemarle County School Board, 293 F.3d 716 (4th Cir. 2002), and Williams v. Cerberonics, 871 F.2d 452 (4th Cir. 1989) in support of its position.  In Dugan, the Court of Appeals specifically noted that in discrimination claims involving local school system RIF policies, the issue is not whether Virginia law mandates the RIF policy, but whether the employment action violated federal anti-discrimination law.  Dugan, 293 F.3d at 722.  Williams likewise contains no such statements to the contrary.  Thus, neither case provides the authority that the School Board seeks.

Alternatively, Marlow emphasizes that the *post hoc* rationalization of the Superintendent's decision to RIF Marlow constitutes affirmative evidence that the School Board's stated application of the RIF policy was merely pretextual, unworthy of belief. (Pl.'s Br. at 27.) Indeed, "[t]he fact that an employer has offered inconsistent *post hoc* explanations for its employment decisions is probative of pretext." Dennis, 290 F.3d at 647 (citing EEOC v. Sears Roebuck, 243 F.3d 846, 852-53 (4th Cir. 2001)). Here, the *post hoc* interpretation issued by the Superintendent, viewed at this stage in the light most favorable to the Plaintiff, indicates that the Superintendent and School Board knew, at the very least, that the RIF policy was ambiguous with respect to the definition of "position classifications." It also provides a basis to conclude that the Superintendent exercised significant discretion in applying the policy, especially where he, alone, interprets it.[14] By conforming the policy to support termination of Marlow's position, as opposed to that of Bullis, the Superintendent's *post hoc* interpretation is a fact probative of pretext. See Dennis, 290 F.3d at 647.

Another RIF decision provides further evidence that the RIF policies may be pretextual. As noted earlier, contemporaneously with the decision to eliminate the DBGR position, Newsome proposed, and the School Board accepted, the RIF of the two technology education teachers under dubious circumstances, using a list that supposedly included all technology educators who were listed according to seniority, and including a summary of their college coursework. (See Pl.'s Br. at Exs. 16, 19; Gray Decl.; Hill Decl.) Apparently, pursuant to the RIF policy that allows the Superintendent to make RIF recommendations based on "skills" of the

---

[14]Such broad interpretive authority also belies the School Board's argument that the Superintendent's authority is limited, and that the School Board has the ultimate authority in approving a RIF. (See Def.'s Br. at 17.)

teachers relative to the "needs" of the school system in lieu of seniority, he terminated two

technology education teachers. (Pl.'s Br. at Exs. 16, 19; Gray Decl. ¶¶ 9-10; Hill Decl. ¶¶ 6-7.)

The critical "needs" of the school system and "skills" of the teachers cited by the Superintendent

involved "technology skills," which he equates to "21st Century skills." (Newsome Dep. At 53-

55; Gray Decl. ¶ 9; Hill Decl. ¶ 7.)[15]

There is evidence in the RIF of the technology education teachers to suggest that the RIF

reflected age-bias on the part of the decision-maker. First, the most senior and the oldest

teachers on the list were the only two "laid off" as a result of the RIF. (Pl.'s Br. at Ex. 16.)

Second, and most significantly, one of the youngest technology educators was omitted from the

list, effectively insulating her from the pool subject to the RIF. (Compare Pl.'s Br. at Ex. 16 with

Pl.'s Br. at 19.)

The RIF of the technology education teachers resulted in a grievance by one of the

teachers eliminated -- one James Hill ("Hill"). During his subsequent grievance process, the

Superintendent's representative justified the decision in part on the need to retain teachers

qualified to teach "Auto CAD" classes. (Hill Decl. ¶ 6; Gray Decl. ¶ 8.) Neither Hill nor the

other terminated teacher taught such classes. (Id.) However, the much younger teacher who was

not named on the list also did not teach "Auto CAD" classes. (Hill Decl. ¶ 10; Gray Decl ¶ 12.)

Thus, although the younger teacher possessed at least one of the supposed deficiencies used to

_____

[15]In opposing the Plaintiff's motion to compel, the School Board persists in its argument that the technology educator RIF is irrelevant to Marlow's case. (Def.'s Br. Opp'n Mot. Compel at 3-4.) The "technology skills" criterion, because it may equate with "21st Century skills," was directly compared with seniority by the Superintendent's analysis. Thus, together with the other possible evidence of age-bias, the technology educator RIF could make it more likely that age was a factor in applying "21st Century skills" as an employment criterion. See Fed. R. Evid. 401.

terminate Hill, that teacher was never even considered for the RIF.  Such a scenario presents

additional evidence from which a jury could infer that the Superintendent's use of technology or

"21st Century skills" as a RIF criterion was not age-neutral.

Finally, the School Board's argument that the RIF policy dictated only one outcome, and

that Newsome's hands were, so to speak, otherwise "tied," is inconsistent with the deposition

testimony in the case.  Thomas testified in deposition that she met with Marlow and Frickert to

discuss a proposal to eliminate the CIS position and subsume those responsibilities under

Marlow as DBGR.  (Thomas Dep. 127:20-23; Thomas Aff. ¶ 3; Frickert Dep. 10-12.)  Marlow

and Frickert protested, arguing that such an action would adversely impact accreditation, and

ultimately, the decision was made to terminate Marlow's position.  (Thomas Dep. 127:20-23.)

Thus, it can be argued that the Superintendent's hands were not "tied."  Indeed, it appears that in

making decisions about which positions to eliminate, Thomas and Newsome were dealing with

essentially interchangeable parts.  See Herold, 864 F.2d at 320 (job duties were

"interchangeable," undermining argument that employer could not "bump" a worker with less

seniority or with a different "job classification").  Further illustrating the point, Marlow was

previously responsible for the duties subsumed in the DBGR position when she served as DCR

for nearly twenty years.  Thus, the DCR and DBGR positions appear to simply split the

responsibilities formerly encompassed in a single position.  Which position would subsume the

roles of the other is of no apparent consequence, at least on the basis of the present record.

An otherwise "neutral RIF method" does not give rise to an inference of age

discrimination.  See, e.g., Mereish, 359 F.3d at 338.  There is at least some evidence, however,

that the RIF process employed in regard to Marlow was not "neutral."  Although it is not this

Court's role to "second-guess" the Superintendent and School Board's managerial decisions, where such decisions might be "improperly motivated by discriminatory animus," a plaintiff may pursue a claim under the ADEA. Accordingly, the School Board's reliance on the RIF policies as a legitimate, non-discriminatory reason for its employment decision regarding Marlow is subject to challenge by sufficient evidence to create a material issue for a jury.

### 3.) Marlow's "21st Century Skills"

Finally, the School Board offers voluminous evidence supporting its argument that Newsome's reference to "21st Century skills" is nothing more than a reference to a well-established skill set, which constitutes a legitimate, non-discriminatory reason for Newsome's decision to RIF Marlow. (Def.'s Br. at 19.) Indeed, from the record, the Plaintiff cannot legitimately contest the fact that one meaning of the term "21st Century skills" refers simply to a recognized set of skills. (See Def.'s Br. at Exs. E, F, H.) But that is not the issue. Rather, the issue is whether the Superintendent harbored an age-related bias when evaluating employees' "21st Century skills."[16]

In part, the School Board challenges the relevance of Newsome's "21st Century skills" comment, calling it a "gratuitous comment Marlow invited by suggesting that she replace Bullis, but which was wholly unrelated to any employment decision." (Def.'s Reply at 4.) Moreover, the School Board suggests that finances were the sole reason for Newsome's decision, while simultaneously discussing Marlow's inadequate "21st Century skills," and noting that such a

---

[16]At oral argument, counsel for the School Board concluded his argument by emphasizing, repeatedly, that no reasonable jury could infer discriminatory motives because of the voluminous evidence that "21st Century skills" are a recognized skill set. Indeed, the Court credits the evidence of same. However, any legitimately recognized skill could be associated with age in a discriminatory manner (i.e. stereotyped). That is the issue at hand.

skill-deficit constitutes a legitimate, non-discriminatory reason for Marlow's RIF. (Def.'s Br. at 19; Def.'s Reply at 4-5.) Such a position may be valid, but the context and construction of such a comment is a matter of weight, not sufficiency, of the evidence. The School Board's arguments regarding the meaning of "21st Century skills" may be presented to, and accepted by, a jury, but the issue cannot be resolved on summary judgment. See Anderson, 477 U.S. at 255.

It is also worth noting that the School Board has only tacitly placed Marlow's qualifications in issue. Indeed, the School Board concedes that Marlow was meeting expectations throughout her tenure. (Def.'s Br. at 17.) Additionally, the School Board argues that whether the Superintendent correctly concluded that Bullis was more adept in the area of "21st Century skills" is irrelevant. (Id. at 19.) In general, and without additional evidence of age-bias, such a position may be correct. See Hill v. Augusta County School Board, 636 F. Supp. 2d 492 (W.D. Va. 2009). But here, Marlow offers substantial, superior qualifications to those of Bullis, as well as her twenty years of experience as DCR. (See Marlow Decl. ¶ 1.) She also offers more than a mere scintilla of evidence that the one criterion cited by Newsome -- "21st Century skills" -- may have reflected age-bias. See Jennings v. Univ. of N.C., 444 F.3d 255, 266 (4th Cir. 2006) (citing Anderson, 477 U.S. at 248).

On the present record, there is evidence that Newsome may have correlated competency in "21st Century skills" with age. The August 13, 2009 PowerPoint created and used by the Superintendent specifically associates competency in the area with age by its distinction between "digital natives" and "digital immigrants." (Pl.'s Br. at Ex. 25.)[17] That distinction, as presented

---

[17]The parties both place great emphasis on the apparent age of persons depicted in the PowerPoint slides. Alone, the Court does not find the photographs sufficiently probative of the ultimate issue. Rather, the Court notes the written contents of the PowerPoint.

in the PowerPoint presentation, appears to associate "chronological age" with technological competency.  See Mereish, 359 F.3d at 337 (distinguishing between the currency of a person's skill sets as opposed to "chronological age").

Moreover, the "CITE Survey" referenced at the beginning of the slide show required respondents to categorize their age as below 30 years of age, between 31 and 40, between 41 and 51, or 52 years of age and older.  (Id.)  Certainly, the Court does not question the social science involved with such a survey question.  Nor does the Court weigh the veracity of the "digital native" versus "digital immigrant" question.  Rather, the Court simply concludes that a jury could determine from such evidence that the Superintendent held an age-related bias as to competency with "21st Century skills."  A jury also could reject the same conclusion.  Either way, Newsome's PowerPoint slide is evidence of what *he understood* the term "21st Century skills" to signify with respect to age, even if it is a nationally-recognized term of art.  Again, what the term meant to Newsome is ultimately an issue for the jury to resolve.

In isolation, evidence of the PowerPoint presentation may not be relevant, because it was not necessarily associated with Marlow's RIF.  Indeed, "general or ambiguous remarks referring to the process of generational change create no triable issue of age discrimination."  Mereish, 359 F.3d at 336-37 (citations omitted).  In isolation, such references as contained in the presentation may merely reflect a trusim of business life.  EEOC v. Clay Printing Co., 955 F.2d 936, 942-43 (4th Cir. 1992).  But the evidence here is not to be viewed in isolation.  The RIF of the technology educators, which invoked the criterion of "technological skills," provides potential evidence that age-bias may have resulted in the selective application of RIF policies.  In addition, Newsome specifically referenced Marlow's "21st Century skills" when explaining the RIF

29

proposal.  (Marlow Decl. ¶ 12.)  Together, such evidence is sufficient to submit to a jury the question of whether age bias was the ultimate reason for Marlow's proposed demotion.

Therefore, there is sufficient evidence to suggest that the School Board's legitimate, non-discriminatory reasons were mere pretexts, and that impermissible age-bias was a more likely motivating factor.  The Court cannot "disregard critical evidence favorable to the [plaintiff] -- namely, the evidence supporting the [plaintiff's] prima facie case and undermining [defendant's] nondiscriminatory explanation."  Reeves, 530 U.S. at 152 (citations omitted).  Discrediting the evidence in such a way would require the Court to "impermissibly substitute[] its judgment concerning the weight of the evidence for the jury's."  Id. at 153.

### D.      Age was the "But-For" Cause of the RIF Decision

Even after establishing a *prima facie* case and rebutting the employer's legitimate, non-discriminatory explanations, a plaintiff must still put forth sufficient evidence that age was the "but-for" cause of the adverse action.  Gross, 129 S. Ct. at 2350.  Notably, such evidence may, at the same time, significantly aid a plaintiff in establishing her *prima facie* case and in rebutting the employer's legitimate non-discriminatory reasons.  See Reeves, 530 U.S. at 152-53; see also Herold, 864 F.2d at 320.  Thus, the burden-shifting analysis of McDonnell Douglas disappears and only the ultimate burden remains at trial.  In appropriate cases, however, a jury may be permitted to infer the ultimate fact of intentional discrimination from its rejection of the defendant's proffered legitimate, non-discriminatory rationale.  Reeves, 530 U.S. at 147.

Here, Marlow has presented more than just a *prima facie* case and evidence that the School Board's stated reasons are pretextual -- there is admissible, circumstantial evidence that the Superintendent harbored an age bias concerning "21st Century skills."  The Court does not

revisit its analysis with a redundant discussion of relevant facts, which were discussed in detail, *supra*, at Subsection C. However, the Court simply notes that such evidence of *potential* age-bias by the Superintendent precludes the granting of dispositive relief. "[S]ince 'summary judgment is seldom appropriate in cases wherein particular states of mind are decisive as elements of [a] claim or defense,' courts must take special care in cases such as the instant one because motive often is the critical issue in employment discrimination cases." Ballinger v. North Carolina Agricultural Extension Service, 815 F.2d 1001, 1005 (4th Cir. 1987) (internal citations omitted).

In construing the Plaintiff's evidence on summary judgment, the Court emphasizes that it does not conclude that there was any wrongdoing, either by Newsome or the School Board. It is not the Court's role to conclude anything in regard to the ultimate issue. Rather, the Court concludes only that a reasonable jury, if it *believed* Marlow's evidence, and *disbelieved* the School Board's evidence, could find for Marlow at trial. See Reeves, 530 U.S. at 147 (citing St. Mary's, 509 U.S. at 511).

## VI. CONCLUSION

For the reasons stated herein, the Court hereby GRANTS the Plaintiff's motion for leave to file supplemental evidence and DENIES the Defendant's motion for summary judgment.

An appropriate Order shall issue.

        /s/

Dennis W. Dohnal
United States Magistrate Judge

Richmond, Virginia
Dated: November 3, 2010